IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON


BOBBI J. STEELE,                              :

                 Case No. 3:12-cv-156

    Plaintiff,

  -vs-              District Judge Walter Herbert Rice
                  Magistrate Judge Michael R. Merz

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,


    Defendant.         :

# REPORT AND RECOMMENDATIONS

  Plaintiff brought this action pursuant to 42 U.S.C. §405(g) and 42 U.S.C. §1381(c)(3) as it incorporates §405(g), for judicial review of the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Social Security benefits. The case is now before the Court for decision after briefing by the parties directed to the record as a whole.

  Judicial review of the Commissioner's decision is limited in scope by the statute which permits judicial review, 42 U.S.C. §405(g).  The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision.  The Commissioner's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *citing, Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986).

Substantial evidence is more than a mere scintilla, but only so much as would be required to prevent a directed verdict (now judgment as a matter of law), against the Commissioner if this case were being tried to a jury.  *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir. 1988);  *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole.  *Hepner v. Mathews*, 574 F.2d 359 (6th Cir. 1978);  *Houston v. Secretary of Health and Human Services*, 736 F.2d 365  (6th Cir. 1984); *Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984).  However, the Court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.  *Garner, supra.*  If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the Court as a trier of fact would have arrived at a different conclusion.  *Elkins v. Secretary of Health and Human Services*, 658 F.2d  437, 439 (6th Cir. 1981).

To qualify for disability insurance benefits (SSD), a claimant must meet certain insured status requirements, be under age sixty-five, file an application for such benefits, and be under a disability as defined in the Social Security Act, 42 U.S.C. § 423. To establish disability, a claimant must prove that he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §423(d)(1)(A). Secondly, these impairments must render the claimant unable to engage in the claimant's previous work or in any other substantial gainful employment which exists in the national economy.  42 U.S.C. §423(d)(2).

To qualify for supplemental security benefits (SSI), a claimant must file an application and be an "eligible individual" as defined in the Social Security Act. 42 U.S.C. §1381a.  With

respect to the present case, eligibility is dependent upon disability, income, and other financial resources. 42 U.S.C. §1382(a). To establish disability, a claimant must show that the claimant is suffering from a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §1382c(a)(A). A claimant must also show that the impairment precludes performance of the claimant's former job or any other substantial gainful work which exists in the national economy in significant numbers. 42 U.S.C. §1382c(a)(3)(B). Regardless of the actual or alleged onset of disability, an SSI claimant is not entitled to SSI benefits prior to the date that the claimant files an SSI application. *See,* 20 C.F.R. §416.335.

The Commissioner has established a sequential evaluation process for disability determinations. 20 C.F.R. §404.1520. First, if the claimant is currently engaged in substantial gainful activity, the claimant is found not disabled. Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments; if not, the claimant is found not disabled. Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1 (1990). If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. §404.1520(d). Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment; if not, the claimant is found not disabled. Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to

3

the Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform. *Bowen v. Yuckert,* 482 U.S. 137, 145, n.5 (1987).

Plaintiff filed applications for SSD and SSI on September 27, 2005, alleging disability from September 6, 2003, due to low back pain, shoulder pain, fibromyalgia, osteoarthritis, irritable bowel syndrome, urinary incontinence, and bilateral carpal tunnel syndrome. (Tr. 96-100; 122). The Commissioner denied Plaintiff's applications throughout the administrative process, (Tr. 13-25; 442-44; 447-49; 452), and Plaintiff subsequently filed a Complaint in this Court seeking judicial review of the Commissioner' decision. *Steele-Malocu v. Commissioner,* No. 3:09cv383 ("*Steele I*"); see also, Tr. 530-32; 540-63. After the parties fully briefed the issues, Magistrate Judge Sharon Ovington recommended that the Commissioner's decision be reversed and that the matter be remanded to the Commissioner for further administrative proceedings. (*Steele* I, Doc. 12, PageID 74-80; see also, Tr. 556-62). District Judge Timothy S. Black adopted Judge Ovington's recommendations and remanded the matter. (*Steele I,* Doc. 14; see also, Tr. 530-32). In doing so, the Court directed the Commissioner to re-evaluate Plaintiff's severe and non-severe impairments, as well as the combined impact of those impairments on Plaintiff's ability to perform work-related activities, to evaluate the medical advisor (MA) Dr. Daugherty's opinion, and to evaluate treating physician Dr. Gomaa's opinion. *Steele I,* Doc. 12, PageID 79-80; see also, Tr. 561-62 and 515. The Appeals Council then vacated the final hearing decision in *Steele I,* and remanded the case for further proceedings "consistent with the District Court's Order." (Tr. 564-66; see also, Tr. 515.

On remand, Administrative Law Judge Amelia Lombardo held a hearing, (Tr. 752-78), following which she determined that Plaintiff is not disabled. (Tr. 515-27). The Appeals Council

4

denied Plaintiff's request for review, (Tr. 507-09), and Judge Lombardo's decision became the Commissioner's final decision. See *Kyle v. Commissioner of Social Security,* 609 F.3d 847, 854 (6th Cir. 2010).

In determining that Plaintiff is not disabled, Judge Lombardo found that Plaintiff met the insured status requirement of the Act through June 30, 2006. (Tr. 517, ¶ 1). Judge Lombardo also found that Plaintiff has severe left shoulder impingement and residuals of surgery, but that she does not have an impairment or combination of impairments that meets or equals the Listings. (Tr. 518, ¶ 3; Tr. 520, ¶ 4). Judge Lombardo found further that Plaintiff has the residual functional capacity to perform a limited range of light work. (Tr. 521, ¶ 5). Judge Lombardo then determined that Plaintiff is able to perform her past relevant work as a plastic injection mold machine tender and airline security agent. (Tr. 526, ¶ 6). Judge Lombardo concluded that Plaintiff is not disabled and therefore not entitled to benefits under the Act. (Tr. 526, ¶ 6).

In her September 27, 2010, Report and Recommendations in *Steele I*, Judge Ovington reviewed the medical evidence which was a part of the record at that time:

> Plaintiff was injured at work as an airline screener/baggage checker on September 6, 2003, while lifting suitcases that weighed over 70 pounds. She was one month pregnant at the time of the injury. Due to her pregnancy, no immediate diagnostic testing other than a[] sonogram was performed. (Tr. 407). Plaintiff delivered a full-term baby in April 2004. (Tr. 134).
>
> An MRI of Plaintiff's lumbar spine taken on June 23, 2004, was negative. (Tr. 137). In January 2005, Plaintiff's family physician, Edward Kinkopf, D.O., diagnosed her with a lumbosacral strain/sprain, and referred her to an orthopedic surgeon, Aivars Vitols, D.O. (Tr. 172).
>
> Dr. Vitols saw Plaintiff on January 24, 2005. (Tr. 134-36). Plaintiff denied bladder or bowel changes. (Tr. 135). She had a normal gait and could walk heel to toe. (*Id.*). Plaintiff complained of pain on

5

palpation over her sacroiliac ["SI"] joints, and some pain on palpation at the midline of L4-5. (*Id.*). Her dorsolumbarparavertebral musculature revealed moderate myospasm to palpation. (*Id.*). Bilateral hip, ankle and knee motion and bilateral straight leg raising were normal. (*Id.*). Reflexes in the lower extremities were normal. (*Id.*). Dr.Vitols diagnosed sacroiliac sprain and strain, right and left. (Tr. 136). He believed that Plaintiff's symptoms originated from both SI joints. (*Id.*). He recommended therapy and a TENS unit, as well as consideration of bilateral SI joint blocks. (*Id.*).

Dr. Vitols saw Plaintiff again on April 21, 2005, to evaluate her complaints of left shoulder pain. (Tr. 130-31). Examination revealed no obvious deformity of the shoulder, no deltoid flattening, and no isolated AC joint pain. (Tr. 130). Plaintiff did evidence painfully restricted motion of the shoulder with lateral referred pain. (*Id.*). Abduction at 4/5 indicated a relative loss of strength, associated with pain and not a motor deficit. (*Id.*). Speed and drop arm testing both were negative, with no motor or sensory changes of the arm, and shoulder x-rays were unremarkable. (*Id.*). Dr. Vitols' impression was cuff tendonitis with resultant impingement. (Tr. 131). Plaintiff received a pain block injection into her shoulder. (*Id.*).

Lumbar spine x-rays taken on May 3, 2005, revealed disc space narrowing at L5-S1. (Tr. 167). Plaintiff received a second pain block injection from Dr. Vitols on May 6, 2005. (Tr. 129). On May 9, 2005, Dr. Vitols reported that Plaintiff's left leg had given out, causing falls, and that she was using a cane. (Tr. 128). An MRI of the lumbar spine taken on May 18, 2005, showed mild facet arthropathy with no significant foraminal encroachment and no nerve root compromise. (Tr. 158). On June 2, 2005, Dr. Vitols reported that Plaintiff's shoulder pain persisted with no benefit from injections. (Tr. 157). A June 13, 2005, MRI of the left shoulder was normal. (Tr. 156).

Matt Kauffman, D.O., examined Plaintiff on June 16, 2005, for Dr. Vitols. (Tr. 155). On physical examination in a standing position, Plaintiff had markedly restricted motion, with pain limiting the examination. (*Id.*). Plaintiff could flex her trunk forward to touch her mid thigh, but had limited hyperextension secondary to pain. (*Id.*). She also had limited side bending and rotation secondary to pain. (*Id.*). Dr. Kauffman noted that Plaintiff did not appear to have significant paraspinal tenderness, but was tender mostly in her right

spinal region, with some tenderness to the bilateral sacroiliac joints. (*Id.*). In a seated position, Plaintiff had negative straight leg raise. (*Id.*). She had equal deep tendon reflexes, +2/4 both patellar and Achilles reflexes, and +5/5 muscle strength to the extensor hallus, the ankle dorsi flexors, and quadriceps and hip flexors. (*Id.*). In a supine position, Plaintiff had pain with straight leg raising to about 70 degrees, but had good hip range of motion. (*Id.*). She did have pain with Faber test bilaterally. (*Id.*). Dr. Kauffman diagnosed chronic low back pain with chronic bilateral sacroiliac joint pain. (*Id.*). Due to her symptomatology and its length, he referred Plaintiff to another spine specialist for a second opinion. (*Id.*).

Consulting neurosurgeon Scott West, D.O., examined Plaintiff on September 23, 2005, and found that her lumbar motion and bilateral straight leg raising were reduced, while reflexes and sensation in the lower extremities were normal. (Tr. 152). Dr. West recommended continued conservative care. (Tr. 153).

On November 28, 2005, Dr. Vitols noted that Plaintiff's shoulder pain persisted and concluded that conservative treatment had failed. (Tr. 150). He advised Plaintiff that he had little to offer orthopedically for her shoulder. (*Id.*).

Pain management specialist John Moore, M.D., examined Plaintiff on December 8, 2005. (Tr. 180-83). Plaintiff could heel-toe and toe walk, bilateral straight leg raising was normal, and reflexes in the lower extremities were intact. (Tr. 181). Lumbar and left shoulder motion were decreased. (*Id.*). Dr. Moore noted that Plaintiff experienced "giveaway falls" with both legs. (Tr. 182). He recommended a focused strengthening program. (*Id.*).

Eli N. Perencevich, D.O., reviewed Plaintiff's medical record on behalf of the Ohio Bureau of Disability Determination in December 2005. (Tr. 140-47). According to Dr. Perencevich, Plaintiff could lift/carry 10 pounds frequently and 20 pounds occasionally, stand or walk six hours a day, and sit six hours a day. (Tr. 141). Plaintiff never could crawl or climb ladders, ropes or scaffolds, but she occasionally could climb ramps and stairs, and stoop, kneel, crouch, and crawl. (Tr. 142). Plaintiff had to avoid concentrated exposure to extreme cold. (Tr. 144). Gary Hinzman, M.D., another state agency reviewing physician, affirmed Dr. Perencevich's assessment in May 2006. (Tr. 225).

On February 6, 2006, Dr. Moore reported that Plaintiff could

heel-toe and toe walk, bilateral straight leg raising was normal, and reflexes in the lower extremities were intact. (Tr. 235). Lumbar and left shoulder range of motion was decreased. (*Id.*). Dr. Moore administered a trigger point injection. (Tr. 237).

Urologist Steven Dona, D.O., saw Plaintiff on February 15, 2006, because of urinary incontinence. (Tr. 218). Plaintiff underwent a renal ultrasound, which was normal. (*Id.*). On March 3, 2006, a cystoscopy showed no abnormal findings to account for Plaintiff's complaints. (Tr. 215). A uroflowmetry report on March 9, 2006, also was "essentially normal." (Tr. 212). A cystometrogram showed a small capacity bladder with evidence of an overactive bladder. (Tr. 211).

On February 21, 2006, Dr. Moore completed a medical source statement as to Plaintiff's physical capacity, indicating that Plaintiff could not work an eight hour work day. (Tr. 178-78A).

On November 29, 2006, Plaintiff was examined by John Urse, D.O., to obtain a second opinion evaluating her left shoulder problem. (Tr. 274-75). Examination revealed marked pain with range of motion, particularly abduction and forward flexion; marked pain over her left acromioclavicular joint and with palpation over the anterior leading edge of her acromion; and detectable crepitus on abduction. (Tr. 274). Dr. Urse suspected acromioclavicular joint sprain relative to her left shoulder pain. (Tr. 276). Plaintiff received a AC injection. (*Id.*).

On January 30, 2007, due to suspected gastroesophageal reflux disease and altered bowel habits, Plaintiff underwent an esophagogastroduodenoscopy with a CLO test and biopsy of the gastric region and the distal esophagus, and a colonoscopy of the cecum with random biopsy of the descending colon. (Tr. 297). Plaintiff's postoperative diagnoses included possible Barrett's esophagus at 35 cm, biopsied; chronic gastritis; bile gastritis; and tortuous colon to the cecum. (*Id.*).

On February 2, 2007, Plaintiff underwent left shoulder arthroscopy with bursectomy and decompression, due to left shoulder impingement and acromioclavicular joint arthritis. (Tr. 296).

On February 15, 2007, Troy Tyner, D.O., saw Plaintiff for follow-up regarding her reflux symptomatology. (Tr. 306). Dr. Tyner reported that protein pump inhibitors had caused Plaintiff to

8

> have diarrhea and were discontinued. (*Id.*).
>
> Lance Tigyer, D.O., examined Plaintiff on March 1, 2007, for complaints of low back pain and bilateral posterior thigh pain. (Tr. 308-09). Plaintiff had a normal gait and could heel-toe walk. (Tr. 308). Lumbosacral spine motion was reduced, but hip motion was normal. (*Id.*). Lower extremity motion was full, strength was normal, and no sensory or reflex deficits were evident. (Tr. 309). Lumbar spine x-rays showed mild degenerative changes and partial sacralization of the L5 vertebrae. (*Id.*). Dr. Tigyer recommended an MRI to determine Plaintiff's surgical candidacy. (*Id.*).
>
> Plaintiff treated at The Dayton Outpatient Center Pain Clinic from October 2007 to April 2008, for diagnoses of chronic low back pain, chronic myofascial pain syndrome, restless leg syndrome, and possible bilateral carpal tunnel syndrome of both hands. (Tr. 377-84).
>
> Laila Gomaa, M.D., saw Plaintiff in June 2008. (Tr. 407-09). Plaintiff had a slow gait, but no sensory, reflex or motor deficits in the extremities. (Tr. 408). Bilateral straight leg raising was normal, but lumbar motion was reduced. (*Id.*). There was some spasm in the lumbar area. (*Id.*). Plaintiff stated that she took her prescribed medications with good pain relief, and increased her daily activities while taking her medications. (*Id.*). Dr. Gomaa opined that Plaintiff could not return to her previous job, but could lift up to 20 pounds with no repetitive lifting, have frequent changes in postural activities as needed, and do no overhead work. (Tr. 409).
>
> Dr. Gomaa completed a work capacity form on August 20, 2008. (Tr. 410). According to Dr. Gomaa, Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; could sit six hours and walk, stand or lift two hours; could not climb; and could operate a motor vehicle for up to two hours. (*Id.*).

*Steele I*, Doc. 12, PageID 61-68; Tr. 543-50. In addition, Judge Ovington noted the medical advisor's (MA) testimony:

> Norris Dougherty, M.D., testified as the medical expert as the administrative hearing. (Tr. 484-98). Dr. Dougherty testified that although Plaintiff alleged carpal tunnel syndrome, no EMG studies in the record confirmed that diagnosis. (Tr. 487, 490). Plaintiff also alleged fibromyalgia, but no bone scan

> appeared in the record and no rheumatologist discussed trigger points. (Tr. 487). Dr. Dougherty testified that all of Plaintiff's MRIs showed no significant findings regarding her persistent back pain. (Tr. 489). Her diagnoses have been lumbar strain, sacroiliac sprain, and "various things of that nature," but she complains of constant pain and pain with coughing or sneezing. (*Id.*). Dr. Dougherty testified that Plaintiff did not meet any of the listings because her symptoms were subjective and not supported by objective medical evidence. (*Id.*).
>
> Dr. Dougherty testified that Plaintiff's reported stress incontinence and frequent bowel movements nonetheless would impact her employability. (Tr. 488-89, 494). Dr. Dougherty opined that Plaintiff would be restricted to sedentary work due to back pain and pain with coughing and sneezing, and she should not do heavy lifting. (Tr. 496).

*Steele I*, *supra,* PageID 68-69. On remand, additional medical evidence became a part of the record.

The record contains a copy of Plaintiff's treatment records dated October 16, 2002, through February 23, 2005, from Dayton Orthopaedic Surgery and Sports Medicine Center. (Tr. 703-19). Those records reveal that Plaintiff received treatment from Dr. Paley for a wrist impairment. *Id.* An April 10, 2003, EMG was normal with no evidence of radiculopathy, plexopathy, or generalized peripheral neuropathy. *Id.* Over time, Dr. Paley noted that Plaintiff had positive Tinel and Phalen's signs, good wrist range of motion, and no atrophy. *Id.*

The record contains a copy of Plaintiff's treatment notes from Centerville Family Practice dated July 8, 2010, through February 4, 2011. (Tr. 599-605; 642-55). Those records reflect that Plaintiff received treatment at that facility for various medical

conditions and complaints including dysuria, hematuria, joint pain, vomiting, vaginitis, irritable bowel syndrome, anxiety, sleeplessness, and rash. *Id.* A July 23, 2010, MRI of Plaintiff's left hip revealed mild bilateral greater trochanteric bursitis and findings suggestive of mild bilateral sacroiliitis. *Id.*

Plaintiff underwent a laparoscopy, lysis of adhesions, aspiration of right and left ovarian cysts, hysteroscopy, dilatation and curettage, and an ablation in June 16, 1011, which Dr. Pawlosky performed. *Id.*; see also, Tr. 689-702.

Plaintiff continued to receive treatment from orthopedist Dr. Urse during the period November, 2006, *supra,* through October, 2009. (Tr. 606-43). On January 20, 2010, Dr. Urse reported that he first saw Plaintiff in November, 2006, when she sought a second opinion evaluation of her left shoulder, at that time a recent MRI revealed some thickening of the AC joint and xrays revealed some subtle narrowing of the left AC joint, and that he injected Plaintiff's shoulder and recommended therapy. *Id.* Dr. Urse also reported that he again saw Plaintiff in January, 2007, at which time she complained of a return of the shoulder pain, that in February, 2007, he performed a diagnostic and surgical arthroscopy including an arthroscopic rotator cuff debridement and clavicle resection, and that post-op physical therapy was ordered but Plaintiff did not return to his office until September, 2009, at which time she reported she had been diagnosed with carpal tunnel, her insurance would not approve surgery, she had stopped wearing her brace, and that she had numbness and tingling in her hand. *Id.* Dr. Urse noted that at that time, xrays showed a flat acromion and previous resection of the lateral clavicle, but no evidence of joint arthropathy, Plaintiff

11

had positive Tinel and Phalen signs, a negative Circle O sign, and that he injected her bursa. *Id.* Dr. Urse noted further that Plaintiff returned on October 26, 2009, at which time he reported to her that an EMG was normal with no signs of carpal tunnel syndrome or other abnormalities and that an MRI showed minimal bursitis and no evidence of labral pathology or significant rotator cuff pathology. *Id.* Dr. Urse also noted that Plaintiff had 170 degrees forward flexion, 140 degrees of abduction, external rotation to the L3 vertebra, a positive apprehension test on the left with the arm abducted 90 degrees and posterior pressure on the humeral head, and a positive Sulcus sign, and that he suspected a left shoulder anterior/inferior instability. *Id.* In his January, 2010, report Dr. Urse noted that he had not seen Plaintiff since October 26, 2009. *Id.*

The record contains additional treatment notes from Dr. Urse dated September 14, 2009, to July 14, 2011, and which reflect that Dr. Urse treated Plaintiff for complaints of hip pain as well as her left shoulder complaints. (Tr. 719-39). A September 21, 2009, MRI of Plaintiff's left shoulder revealed minimal bursitis. *Id.* Dr. Urse identified Plaintiff's diagnosis as multidirectional instability of her left shouder and on July 14, 2011, Dr. Urse performed an arthroscopic examination of Plaintiff's left shoulder which revealed left shoulder joint derangement with subacromial bursitis. *Id.*

The record contains Plaintiff's treatment notes from Peltier Family Chiropractic dated January 14, 2008, through July 25, 2011, and which reflect that Plaintiff received treatment for complaints of neck and back pain. (Tr. 656-67).

Plaintiff sought emergency room treatment on April 30, 2011, for complaints of upper left

leg pain. (Tr. 668-88). Plaintiff was evaluated, treated, and discharged with the diagnosis of muscle strain left thigh/left leg. *Id.*

Plaintiff essentially alleges that the Commissioner erred by failing to find that her alleged lumbar spine impairment is a severe impairment, failing to properly evaluate her arm and shoulder impairment, failing to find that she was entirely credible, and by failing to give the proper evidentiary weight to the opinions of her treating physicians. (Doc. 7, PageID 31).

In support of her first Error, Plaintiff argues that the Commissioner erred by failing to find that her alleged lumbar spine impairment is severe for purposes of the Act.

An impairment can be considered as not severe only if the impairment is a "slight abnormality" which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience. *Farris v. Secretary of Health and Human Services,* 773 F.2d 85, 90 (6th Cir. 1985)(citation omitted); *see also, Bowen v. Yuckert,* 482 U.S. 137 (1987).

An ALJ does not commit reversible error in finding a non-severe impairment where the ALJ determines that a claimant has at least one other severe impairment and then goes on with the remaining steps in the disability evaluation, since the ALJ considers all impairments, including non-severe impairments, in determining residual functional capacity to perform work activities. *See, Maziarz v. Secretary of Health and Human Services,* 837 F.2d 240, 244 (6th Cir. 1987).

First, the Court notes that in determining that Plaintiff is not disabled, the Commissioner found at the second step of the sequential evaluation process that Plaintiff has a severe shoulder impairment and then went on with the remaining steps in the disability evaluation. Therefore, pursuant to *Maziazr,* even assuming that Plaintiff's alleged back impairment is a severe

13

impairment, the Commissioner did not commit error that requires an *automatic* reversal of the Commissioner's decision. However, this Court concludes that the Commissioner erred by failing to find that Plaintiff's lumbar impairment is severe within the meaning of the Act and, for the reasons given below, his failure to do so in this case, takes the matter outside the parameters of *Maziarz*.

Judge Lombardo gave numerous reasons to support her conclusion that Plaintiff's alleged back impairment is not severe within the meaning of the Act. First, Judge Lombardo acknowledged that the Administrative Law Judge Senander, who issued the administrative decision in *Steele I*, had determined that Plaintiff's lumbar sprain was a severe impairment. (Tr. 518). However, Judge Lombardo also acknowledged that she disagreed with Judge Senander's conclusions. *Id.* In doing so, Judge Lombardo noted that since her 2003 work-related accident, the findings with respect to Plaintiff's lumbar spine have been only mild. *Id.* However, a review of the record reveals that Plaintiff's treating and examining physicians have documented positive objective clinical findings with respect to Plaintiff's lumbar impairment.

Treating physician Dr. Vitols' treatment notes reveal that Plaintiff underwent SI blocks to which she did not respond, that she exhibited moderate muscle spasm and painfully restricted lumbar motion, pain to palpation over both SI joints and at the midline of L4-5, and paraspinal tenderness. See, *e.g.,* Tr. 128-29, 135, 155). Consulting neurosurgeon Dr. West noted that Plaintiff had moderate discomfort on palpation of the lower lumbar spine, limited ranges of motion, and positive straight leg raising. (Tr. 152). Plaintiff's treating sources at Centerville Family Practice reported that Plaintiff exhibited spinal tenderness and muscle spasms, decreased ranges of motion, See, *e.g.,* Tr. 171, 176, 319, 321, 352). Dr. Tigyer reported that Plaintiff exhibited decreased range

14

of motion and tenderness of the lumbar spine. (Tr. 308). Treating pain specialist Dr. Gomma reported that Plaintiff had a stiff, slow gait, exhibited muscle spasms in the paravertebral lumbar region, had reduced ranges of motion, (Tr. 408), and Dr. Urse noted decreased ranges of motion and tenderness of the lumbar spine. (Tr. 613. In other words, although Plaintiff's medical test results have revealed, at worst, mild findings, the record is replete with positive clinical findings relating to Plaintiff's alleged lumber impairment.

Although *Maziarz* provides that the ALJ does not commit reversible error in finding a non-severe impairment where the ALJ determines that a claimant has at least one other severe impairment and then goes on with the remaining steps in the disability evaluation, since the ALJ considers all impairments, including non-severe impairments, in determining residual functional capacity to perform work activities, the facts of this case distinguish it from *Maziarz.* Specifically, in determining that Plaintiff is not disabled, Judge Lombardo found that Plaintiff is capable of "performing light work … except that she can perform only occasional overhead reaching with the left, non-dominant upper extremity." (Tr. 521). Nowhere does Judge Lombardo's residual functional capacity finding allow for any imitations that would be associated with a lumber spine impairment.

For the foregoing reasons, this Court concludes that the Commissioner erred by failing to find that Plaintiff's alleged lumbar impairment is a severe impairment within the meaning of the Act. In addition, for the reasons given above, the Court finds that this matter is outside the parameters of *Maziarz, supra,* and therefore the Commissioner's error has resulted in a decision that is not supported by substantial evidence.

At this juncture, the Court notes that in the absence of a proper evaluation of Plaintiff's

15

alleged lumber impairment, its effect on Plaintiff's residual functional capacity as well as the effect of Plaintiff's impairments in combination, it is not possible to adequately address Plaintiff's remaining Errors.

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to remand the matter for rehearing or to reverse and order benefits granted. The Court has the authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. §405(g). If a court determines that substantial evidence does not support the Commissioner's decision, the court can reverse the decision and immediately award benefits only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary of Health and Human Services,* 17 F.3d 171, 176 (6th Cir. 1994) (citations omitted); *see also, Newkirk v. Shalala,* 25 F.3d 316 (6th Cir. 1994).

The fourth sentence of 42 U.S.C. Sec. 405(g) directs the entry of a final appealable judgment even though that judgment may be accompanied by a remand order. *Sullivan v. Finkelstein,* 496 U.S. 617 (1990). The fourth sentence does not require the district court to choose between entering final judgment and remanding; to the contrary, it specifically provides that a district court may enter judgment "with or without remanding the cause for rehearing." *Id.*

This Court concludes that not all of the factual issues have been resolved and, therefore, the record does not adequately establish Plaintiff's entitlement to benefits. Specifically, the Court finds that while Plaintiff's lumbar spine impairment may be a severe impairment, it does not automatically follow that Plaintiff is disabled and therefore entitled to benefits under the Act.

Therefore, this matter should be remanded to the Commissioner for additional administrative proceedings consistent with this Report.[1]

It is therefore recommended that the Commissioner's decision that Plaintiff is not disabled be reversed. It is also recommended that this matter be remanded to the Commissioner for further administrative proceedings consistent with this Report. Finally, it is recommended that this matter be terminated upon the Court's docket.

January 28, 2013                                                         s/ *Michael R. Merz*
                                                                         United States Magistrate Judge


## NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to seventeen days because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension.   Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

---

[1] In remanding that matter, the Court is aware that Plaintiff filed her application more than seven (7) years ago and that it has been remanded once before this remand.

17